**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2878-12T1

NEW JERSEY DIVISION OF YOUTH
AND FAMILY SERVICES,[1]

    Plaintiff-Respondent,

v.

S.I.,

    Defendant-Appellant.

_____

IN THE MATTER OF S.I., a minor.

_____

<div style="border:1px solid black;">

**APPROVED FOR PUBLICATION**

**August 20, 2014**

**APPELLATE DIVISION**

</div>

Submitted May 29, 2014 – Decided July 2, 2014

Before Judges Sapp-Peterson, Lihotz and Maven.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-270-12.

Joseph E. Krakora, Public Defender, attorney for appellant (Erin L. Pinder, Designated Counsel, on the briefs).

John J. Hoffman, Acting Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of

---

[1] On June 29, 2012, the Department of Children and Families was reorganized and the Division of Youth and Family Services was renamed as the Division of Child Protection and Permanency. L. 2012, c. 16, eff. June 29, 2012 (amending N.J.S.A. 9:3A-10(b)).

counsel; Joyce Calefati Booth, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Olivia Belfatto Crisp, Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

Defendant S.I. appeals from a Family Part order, entered following a fact-finding hearing, which determined she had abused and neglected her minor grandchild for whom she was the legal custodian.[2]  S.I. refused consent to allow the child to undergo a mental health evaluation because she believed the child was being "manipulative" and merely "acting out."  The Division of Youth and Family Services (the Division) executed an emergency removal and sought a psychiatric evaluation to discern whether the child was suicidal.  S.I. challenges the trial judge's factual findings, as well as her application of the law to the facts.  Specifically, S.I. disputes: (1) the single act of withholding her consent for the mental health evaluation demonstrated medical neglect; (2) she failed to exercise a minimum degree of care by withholding her consent for the

---

[2]   It is not clear how long the child was in S.I.'s care and custody.  S.I. testified the child had been in her care for twelve years.  The Division's complaint stated an order granting S.I. custody was entered three years earlier, but the document is not included in the record.

evaluation; and (3) the child suffered or was at imminent risk of suffering harm because she withheld her consent.

We have considered the arguments advanced by the parties. Although we find no fault with the Division's initial decision to remove the child to effectuate a mental health evaluation, we conclude the record lacks substantial credible evidence that S.I.'s conduct amounted to medical neglect or recklessly created a substantial risk to the child's mental health or physical safety. N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1 (2013). Accordingly, we reverse the finding of abuse or neglect.

These facts are taken from the April 5, 2012 fact-finding hearing. During the hearing the State presented testimonial evidence from two Division workers and admitted, without objection, documents evidencing the initial referral and the Division's investigation. S.I. testified in her own behalf.[3]

A school nurse contacted the Division after a note written by S.I.'s then twelve-year-old grandchild was discovered, which stated: "I want to kill myself. I hate my life." When confronted, the child explained she wrote the note more than a month earlier, but admitted being depressed. She stated she

---

[3] We note the child's parents attended the fact-finding hearing, but did not testify.

"ha[d] no plan on how she's going to hurt herself." Further, the child expressed fear of S.I., complaining her grandmother hits her in the back "once per week." The child insisted she did not want to return to S.I.'s care.

A mobile crisis unit was contacted. The record states a response team went to the school, but does not include the results of the child's evaluation.

The school's vice principal contacted S.I. asking her to come to the school. S.I. complied. When told of the discovered note, S.I. did not believe the child was suicidal or desired to end her life. The vice principal informed the Division S.I. became "extremely upset" after the child's comments were disclosed and she "could not be calmed." S.I. insisted the child was acting out after being punished. She repeatedly denied the child's allegations of physical abuse, and suggested the child was merely rebelling. S.I. declined the recommendation she take the child to the hospital for a mental health evaluation.

The vice principal advised the Division worker when he told S.I. the child feared returning home, S.I. responded "She don't want me. I don't want her." S.I. then left the school without the child. Subsequent calls by the vice principal to S.I. went

unanswered. The school called the Division after S.I. left the school.

Division Special Response Unit (SPRU) worker Pedro Cereno responded to the school. He interviewed the child, who said she disliked school because classmates bullied her, called her names and made fun of her appearance. The child complained S.I. yells at her, which causes "feelings of depression" and "she would rather be dead than go through these things." Although the child did not have a plan to harm herself, she feared returning home as "she d[id] not feel safe." Finally, the child expressed she had limited contact with her parents.

Following unanswered calls to S.I., Cereno traveled to her home. The child remained in the school building with another SPRU worker.

Cereno spoke to S.I. regarding the note found by school officials and urged her to take the child to the hospital for a psychiatric evaluation. S.I. declined, stating the child was being manipulative as "she ha[d] not gotten her way." S.I. explained the child was spoiled and accustomed to getting what she wanted; however, S.I. had lost her job and the family could no longer afford to spend money as before. S.I. characterized the child's conduct as reflective of her rebellion because she

5

had "behavioral issues." Finally, S.I. remarked she was being treated for depression as a result of her own circumstances.

S.I. vehemently denied the child's claims of physical abuse and the use of corporal punishment. S.I.'s daughter, who also lived in the home, confirmed the child was not physically abused.

After Cereno again discussed the need to take the child to the hospital, S.I. insisted it was unnecessary and stated she refused to "play into [the child's] manipulation." S.I. additionally stated she did not want to go to the hospital for fear her own depression might trigger an anxiety attack.

Cereno explained if S.I. continued to refuse, the Division would be required to remove the child to obtain the evaluation. S.I. suggested the Division should "assume custody of the child because she wasn't taking the child to the hospital." Cereno also testified S.I. "remained adamant of the fact that if the child didn't want to be in the home, that she was not going to have her there." Cereno then offered to provide homemaker services for the household, but S.I. responded: "Hell [n]o."

S.I. refused to sign the notice of emergency removal. Consequently, the Division effected a Dodd removal and assumed

the child's temporary care, custody, and supervision.[4]  The child was immediately taken to Jersey City Medical Center for a psychological evaluation, where she "was screened, not deemed a risk and . . . released."

Sarah Overholser, the caseworker who assumed responsibility for the case after the child was removed, also testified.  She stated the Division's investigation revealed the child's claims of physical abuse by S.I. were "unfounded."[5]  The Division also communicated with the child's parents, who expressed they maintained regular contact with her.

---

[4]  "'A "Dodd removal" refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. "Pat" Dodd in 1974.'" N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011) (quoting N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2, (App. Div. 2010)).

[5]  A "substantiated" finding is one where "the available information, as evaluated by the child protective services investigator, indicates by a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.A.C. 10:133-1.3 because the alleged child victim has been harmed or placed at risk of harm by a parent or guardian." An unsubstantiated finding, therefore, is one where the evidence is insufficient to make such an evaluation.  This differs from an "unfounded" finding, which is made when "[t]here is not a preponderance of evidence that the alleged child victim was harmed or placed at substantial risk of harm;" or "[t]here is not a preponderance of evidence indicating that a parent or guardian and child were involved." N.S., supra, 412 N.J. Super. at 607 n.1 (alteration in original) (citation omitted).

S.I. testified regarding her meeting with school officials and her interview by the Division. She stated the vice principal declined her requests to talk to the child when she did not want to return home. S.I. asked what she should do and what the school was going to do, but the vice principal just "shrugged"; so she left. She insisted the vice principal never stated the child needed a psychiatric evaluation.

In speaking with Cereno, S.I. related she lost her job and "had gotten very ill with depression" and "had basically a breakdown." S.I. explained her depression and anxiety caused her to become "mixed-up," "overwhelm[ed]," and unable to adequately explain her position or "get [] Cereno to understand" her view of the child's behavioral concerns. S.I. stated the child was "not being abused physically or any other way." S.I. noted since her employment ended, she discovered the child's "failing grades [and] horrible attitude toward her aunts." S.I. started to address these issues with the child, who reacted by "crying and ranting and raving." S.I. believed the child's comments, as related by the vice principal, showed she was "acting out."

S.I. professed she loved the child, denied stating she did not want her, and insisted she wanted what was best for her. She steadfastly asserted the child would "never have committed

suicide." Rather, she suggested the child "was being vindictive" because a few days earlier S.I. had forbade the child from attending the local Boys and Girls Club until her grades improved. S.I. believed the child was "just a teenager acting out because she was failing and I wanted her to redirect."

S.I. also related she feared going to the hospital because of her own depression and anxiety. She asserted her daughter offered to take the child to the hospital, but Cereno would not permit the aunt to accompany the child to the hospital.

At the conclusion of the hearing, the judge entered her oral opinion. She found S.I. was "a very intelligent, obviously well-educated woman" and recognized the difficulty associated with being and raising a teenage girl. However, she found S.I. refused to take the child for a mental health assessment when "[c]learly the child was in probable danger of having some kind of a serious mental episode." Addressing S.I.'s explanation of the child's behavior, the judge commented:

> whether [the child's behavior] was just for attention or whether it was really serious, that's not [a decision] for the caregiver to make. . . . [T]hat's for the experts. That's for the people in the Medical Center or wherever who will sit down and do mental testing on someone to make sure that they are not a danger to themselves.

A-2878-12T1

The judge related concerns for teenage suicide, the emotional turmoil caused by bullying, and a young person's inability to fully appreciate the consequences of his or her actions and the possibility of change in the future, stating:

> [W]ould she have done it? Nobody knows that.
>
> But as the caregiver, do you have the obligation to do everything that you can to make sure that this child will not harm herself? You bet you do.

The judge determined S.I. "was obligated to take this child for a medical health assessment after [she] had threatened suicide and she refused to do so." S.I. received specific instructions regarding how to address the issue, but refused to comply. Accordingly, the judge determined the Division established by a preponderance of the evidence that the child was "abused or neglected" and S.I.'s failure to act amounted to medical neglect.

After dispositional hearings, the child was placed in the legal and physical custody of her father, and the litigation was terminated. S.I. filed this appeal.

S.I. argues the trial judge erred in finding the Division met its burden to show medical neglect by a preponderance of the evidence as the judge's factual findings were not supported by adequate, substantial, and credible evidence in the record.

S.I. urges the findings of abuse or neglect cannot be sustained solely because she disagreed with the Division's recommendation that the child needed a mental health evaluation. Moreover, she contends a single instance of allegedly blocking suggested care does not rise to the level of gross negligence or reckless disregard for the child's safety.

Our standard of review on appeal is narrow. We defer to the Family Part's findings of fact based on those findings. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "[F]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Deference to a trial court's supported factual findings is warranted because the trial judge "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand [and] . . . has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008). Nevertheless, "[w]here the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our

review." G.L., supra, 191 N.J. at 605 (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). The trial judge's legal conclusions and the application of those conclusions to the facts are subject to plenary review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The adjudication of abuse or neglect is governed by Title 9, which is designed to protect children who suffer serious injury inflicted by other than accidental means. G.S. v. Dep't of Human Servs., 157 N.J. 161, 171 (1999) (citing N.J.S.A. 9:6-8.8). See also N.J.S.A. 9:6-8.21 to -8.73 (governing protection of abused and neglected children). "The statute in question addresses harm to a child[.]" A.L., supra, 213 N.J. at 8. An "abused or neglected child" is defined in N.J.S.A. 9:6-8.21(c) as

> a child less than 18 years of age whose parent or guardian, as herein defined, . . . or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so . . . .

Whether a parent or guardian has engaged in acts of abuse or neglect is considered on a case-by-case basis and must be "'analyzed in light of the dangers and risks associated with the situation.'" N.J. Dep't of Children & Families v. R.R., __ N.J. Super. ___, ____ (App. Div. 2014) (slip op. at 7) (quoting G.S., supra, 157 N.J. at 181-82). Under the statutory standard, "something more than ordinary negligence is required to hold the actor liable." G.S., supra, 157 N.J. at 178. Proscribed is "conduct that is grossly or wantonly negligent, but not necessarily intentional." Ibid. The standard "implies that a person has acted with reckless disregard for the safety of others." Id. at 179. However, whether a particular event is mere negligence, as opposed to gross or wanton negligence, can be difficult to determine. See N.J. Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309 (2011).

A court considering whether a parent or guardian's conduct meets the statutory standard must analyze all facts, N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011), and decide whether the parent or guardian exercised a minimum degree of care under the circumstances. N.J. Div. of Child Prot. & Permanency v. J.A., ___ N.J. Super. ___, ___ (App. Div. 2014) (slip op. at 9).

13                                                          A-2878-12T1

During the fact-finding hearing, the State bears the burden and must present proofs to establish abuse or neglect as defined in the statute.  P.W.R., supra, 205 N.J. at 32; N.J.S.A. 9:6-8.46(b).  Specifically, the State must "demonstrate by a preponderance of the competent, material and relevant evidence the probability of present or future harm" to the minor child. N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004) (citation omitted), certif. denied, 182 N.J. 426 (2005).

We recognize that "the elements of proof are synergistically related."  V.T., supra, 423 N.J. Super. at 329, (citation and internal quotation marks omitted).  In this regard, "[o]ne act may be substantial or the sum of many acts may be substantial" to prove abuse or neglect.  Id. at 320 (citation and internal quotation marks omitted).  A court need not wait until a child is actually harmed or neglected before it can act to address parental conduct adverse to a minor's welfare.  N.J. Div. of Youth & Family Servs. v. V.M., 408 N.J. Super. 222, 235-36 (App. Div.) (citing In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)), certif. denied, 200 N.J. 505 (2009), cert. denied, ___ U.S. ___, 130 S. Ct. 3502, 177 L. Ed. 2d 1095 (2010).

"[N]on-intentional conduct is sufficient to warrant a finding of abuse if injury to the child is demonstrated." S.S., supra, 372 N.J. Super. at 24 (citing G.S., supra, 157 N.J. at 175-82). However, when "there is no evidence of actual harm, . . . the statute requires a showing of 'imminent danger' or a 'substantial risk' of harm before a parent or guardian can be found to have abused or neglected a child." A.L., supra, 213 N.J. at 8 (citing N.J.S.A. 9:6-8.21(c)). If an isolated act "appears to be aberrational," labeling the parent a child abuser may be inappropriate. N.J. Div. of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 512-13 (App. Div. 2010), certif. dismissed, 208 N.J. 355 (2011).

Guided by these principles we examine the facts in this matter. The issue presented is whether S.I.'s refusal to take the child to the hospital for a psychiatric evaluation constituted a failure to exercise a minimum degree of care, recklessly creating "harm, or [the] substantial risk thereof[.]" N.J.S.A. 9:6-8.21(c)(4)(b). A teenager's expression tantamount to thoughts of suicide should never be ignored by adults. However, the facts presented here are so limited we can only conclude this evidence fails to prove the child was in "imminent danger" or that a "substantial risk" of harm would result from

15

S.I.'s refusal to seek immediate psychiatric review, which are prerequisites to sustain a finding of abuse or neglect.

The Division presented Cereno's report, which included the school's reaction to finding the child's note on December 8, 2011. The child admitted penning the note, sometime in October, possibly six to eight weeks earlier. The child stated she was depressed, but also affirmed she had no plans on how to harm herself. In his discussion with the child, Cereno noted the child related poor relationships with her family members and alleged physical and verbal conflict with S.I.

When confronted with the note stating the child "wanted to kill herself," school and Division workers appropriately reacted to determine the depth of the child's depression. The facts show the child was upset, possibly distraught by her perceived treatment by S.I., and she was also troubled by her classmates' conduct, a longstanding problem the school was purportedly addressing. But the record contains no evidence that describes the child's behaviors when she was examined by the mobile crisis unit or any recommendation by those responders after speaking with the child. The record also lacks evidence demonstrating the effect of S.I.'s conduct. The judge observed, mental health concerns attendant to the behavior identified by school officials are a subject left for experts to determine. At

A-2878-12T1

trial, no evidence was offered assessing the level of risk posed. When S.I. refused to take the child to the hospital, certainly at that time the child's safety was secured by the intervention of school and Division officials. Acting as parens patriae, the Division had the child examined. Therefore, even though S.I. declined to take the child to the hospital because she disagreed with the Division's assessment of the circumstances, she did not thwart efforts to obtain the desired evaluation. The Division later learned the hospital could not identify any underlying medical or mental health conditions, and did not recommend a course of necessary treatment, or diagnose a risk requiring immediate care.

There are additional undisputed facts not addressed in the judge's opinion, which support S.I.'s belief the child's comments did not manifest urgent attention. S.I.'s decision was informed by her parental experience, from which she concluded the child was exhibiting teenage rebellion after being disciplined for poor school performance. These include: S.I. had raised the child for most of her life, without incident or intervention from the Division; S.I.'s recent unemployment caused her to more closely scrutinize the child's behaviors, which she identified as more disrespectful as she entered her

17                                                                    A-2878-12T1

teens; and S.I. related the child's previous attempts at manipulation, when disciplined or denied what she wanted.

S.I. also had demonstrated her care for the child's well-being. She detailed proactive efforts undertaken to curtail peer bullying and implement protocols with teachers to aid the child in the event of future incidents. S.I. also initiated counseling for the child to assist with these concerns.

Admittedly, when told of her granddaughter's interview comments and the feelings she expressed in the uncovered note, S.I. became upset, angered, and her statements suggest she felt rejected. We do not countenance S.I.'s lack of cooperation with the school or the Division. Her decision declining to immediately seek a mental health evaluation perhaps was a mistake; however, it cannot be said to rise to the level of gross or wanton negligence.

We also cannot ignore S.I.'s view of her granddaughter's behavior in part was justified by the Division's investigation, which concluded the child's claims of physical abuse at the hands of S.I. were unfounded, not merely unsubstantiated. The child's claim of estrangement from her parents also was not supported by the parents' statements.

The trial judge did not reject S.I.'s testimony as not credible. Rather, she rejected S.I.'s view on the need for the

child's mental status examination based on a general concern for teenage suicide and the emotional effects of bullying. There is no evidential support for the judge's finding that this child "was in probable danger of having some kind of mental episode." The record contains no expert evidence or even admissible documentary evidence supporting this assertion. Indeed, the record reflects only the judge's opinion, which cannot be used to substantiate legal conclusions. "Judges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm. Instead, the fact-sensitive nature of abuse and neglect cases, turns on particularized evidence." A.L. supra, 213 N.J. at 28 (internal citation omitted).

Examining the totality of the facts and circumstances facing this family, we cannot conclude S.I.'s emotional and angry response to her granddaughter's comments was grossly or wantonly negligent, made knowing that injury was likely or made with reckless disregard that substantial likelihood of harm would befall the child. No evidence was presented to demonstrate the child's physical, mental, or emotional condition was impaired or that she was in imminent danger of harming herself as a result of S.I.'s decision to decline the recommendation for an immediate evaluation. Accordingly, the

judge's conclusion to the contrary cannot withstand scrutiny and the underlying evidence is insufficient to show abuse or neglect.

Our comments must not be misunderstood as questioning the Division's precautionary response to assure the child received a mental health evaluation. When the SPRU worker was confronted with the child's comments during her interview and her feelings expressed in the uncovered note, along with S.I.'s refusal to take the child straight to the hospital, the need to act was manifest. In fact, S.I.'s extreme emotional response prevented her from offering a reasoned alternative course, leaving removal as the only available option. However, rather than resorting to Title 9, the Division has extensive authority to assure children are protected under the State's child welfare laws pursuant to N.J.S.A. 30:4C-11 and -12. As detailed by Chief Justice Rabner's opinion in A.L., these statutory provisions authorize not only services, but as necessary, care and custody. A.L., supra, 213 N.J. at 30-34. Every event requiring the Division's intervention does not result from abuse or neglect.

Moreover, our holding intends to underscore the need for evidence to support a claim of abuse or neglect, as interpreted by the Court in A.L. This includes proof of actual harm or, in the absence of actual harm, "the Division was obligated to

present competent evidence adequate to establish [the child was] presently in imminent danger of being impaired physically, mentally or emotionally." N.J. Div. of Child Prot. & Permanency v. M.C., __ N.J. Super. ___, ___ (App. Div. 2014) (slip op. at 3) (citations omitted). These essential proofs cannot merely be based on the Division's view that the parent or guardian's decision on behalf of a child was ill-advised. Rather, the Division must demonstrate harm or show the likelihood of an imminent substantial risk of harm rising above mere negligence. A.L. supra, 213 N.J. at 28; S.S., supra, 372 N.J. Super. at 24. Such evidence is absent here. Accordingly, S.I.'s demonstrated failure to comply with the recommended psychiatric evaluation was not proven to be medical neglect under N.J.S.A. 9:6-8.21(c)(4).

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2878-12T1