# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0349-13T3

NEW JERSEY DIVISION OF
YOUTH AND FAMILY SERVICES,[1]

      Plaintiff-Respondent,

v.

N.M.,

      Defendant-Appellant,

and

J.K.,

      Defendant.

_____

IN THE MATTER OF
J.K., Jr. and J.K., minors.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **December 24, 2014** |
| **APPELLATE DIVISION** |

Submitted December 1, 2014 — Decided December 24, 2014

Before Judges Sabatino, Guadagno, and Leone.

On appeal from the Superior Court of New
Jersey, Chancery Division, Family Part,
Hudson County, Docket No. FN-09-103-13.

---

[1] Effective June 29, 2012, the Division of Youth and Family
Services was renamed the Division of Child Protection and
Permanency.  L. 2012, c. 16.

Joseph E. Krakora, Public Defender, attorney for appellant (Ruth Harrigan, Designated Counsel, on the brief).

John J. Hoffman, Acting Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors J.K., Jr. and J.K. (Margo E.K. Hirsch, Designated Counsel, on the brief).

The opinion of the court was delivered by

GUADAGNO, J.A.D.

Defendant N.M. (Nina)[2] appeals from the trial court's finding that she abused or neglected her two children by bringing them to a public park to meet her former boyfriend, J.B. (Jeffrey), who followed her home and raped her in the children's presence. Because the Division of Child Protection and Permanency (Division) failed to establish that the children suffered harm as a result of defendant's actions, and because her conduct was neither reckless nor grossly negligent, we reverse.

I.

In light of the arguments raised on appeal, we recite the facts with particularity. Nina is the mother of J.K., Jr.

---

[2] We employ pseudonyms to protect the privacy of the minors and for ease of reference.

A-0349-13T3

(James) and J.K. (Jonah). At the time of the incident which gave rise to this litigation, James was two years old and Jonah was one. J.K., Sr. (Joseph) is the father of both children. He was a named defendant in this litigation, but the Division did not seek a finding of abuse or neglect against him, and he is not a party to this appeal.

The Division first became involved with this family in June 2010, when it received a referral from the Bayonne Police Department that Nina reported that Joseph choked her, threw her to the ground, and shook James, who was then one month old. James was later diagnosed with a skull fracture, a subdural hematoma on the left side of his brain, and retinal hemorrhaging in both eyes. Both parents were found to have abused or neglected James. Joseph admitted to choking Nina and injuring James when he threw the child into a car seat. Nina was found to have placed James at risk by permitting Joseph to care for him when she knew or should have known that the Joseph was prone to violence. Nina appealed and we affirmed. N.J. Div. of Youth & Family Servs. v. N.M., No. A-5808-11 (App. Div. May 10, 2013).

In 2012, Nina was living in an apartment with her mother, her brother F.K. (Fred), and the two children. Joseph remained incarcerated as a result of his conviction for injuring James. Nina met Jeffrey in March 2012, and they began a casual dating

relationship, seeing each other on approximately three occasions until May 2012, when Nina attempted to end the relationship.

On May 24, 2012, a Bayonne police officer responded to a report of domestic violence at Nina's home. When the officer arrived, he spoke with Fred who explained that he and Nina had an argument over a cell phone. The officer entered the apartment and found Nina sitting on the floor of her bedroom with her face covered in blood. Nina explained that after arguing with Fred, she retreated to her bedroom to avoid further conflict, but Fred forced the door open, which struck her in the face, causing a laceration. Fred was arrested and Nina was taken to the hospital for treatment.

On June 24, 2012, Nina called the police again after arguing with Fred. Bayonne Police Officer Michael Zajac responded, but Fred left before he arrived. Nina, who was not injured, did not wish to file a complaint. Nina explained that she feared that her brother might hit her, and she called the police to prevent the matter from escalating. While in the apartment, Zajac noticed that the children were dirty and the apartment was in disarray. He reported the condition to the Division.

Pedro Cirino, a member of the Division's Special Protective Response Unit (SPRU), went to Nina's apartment that evening at

A-0349-13T3

around 8:15 p.m.  After speaking with Nina, Cirino asked to see the children.  He observed that they were asleep in separate cribs and appeared "healthy and clean."  In his report, Cirino noted that "the children's room was found to be somewhat clean and no health or safety factors were identified."  Other parts of the apartment had "housekeeping issues" that needed to be addressed, including clothing strewn throughout the home, a sticky floor in the kitchen that had not been mopped in some time, a child's booster seat which was covered in old food, and dirty dishes in the kitchen sink.  When Cirino looked in the refrigerator, he noticed "plenty of food," but that the refrigerator looked as though it had not been cleaned in some time.

Cirino told Nina that she would be given some time to clean the apartment and he would return within one hour to check the progress.  Nina apologized for the condition of the home and agreed to begin cleaning immediately.  Before leaving, Cirino spoke with Fred who told him the apartment was not usually in this condition.  Fred explained that "things were a mess" because he and his mother were moving out within a few days. Fred agreed to assist Nina in cleaning the apartment.

Cirino returned to the apartment around 10:00 p.m. and detailed the improved conditions in a report:

The floors were no longer sticky and the living room was much more organized. The family emptied out and cleaned both refrigerators and all the dark mold had been cleaned and removed with bleach and disinfectant.

Division caseworker Laura Bulakowski, who had been working with the family since 2011,[3] visited Nina's apartment on the following day. Bulakowski observed that "the home was a lot [cleaner] than the previous day when the . . . referral was originally received." Bulakowski noted Nina's compliance, stating, "[t]he Division gave [Nina] an opportunity to address the housing concerns, and [Nina] was very compliant with the Division."

During Bulakowski's visit, Nina disclosed that she had dated Jeffrey. Bulakowski requested Jeffrey's address so she could conduct a background check, but Jeffrey refused to supply the information, and Nina did not know where he lived. As a result, Bulakowski testified that she advised Nina "that at this time the Division would not like him to be around the children, because we don't know his history, his background history. If he's violent, how his behaviors could be, and it raised a concern to us."

---

[3] After the 2010 matter was dismissed from litigation, the Division kept its case open to monitor Nina's "compliance." Bulakowski testified that during this time she had no concerns with Nina's compliance.

Nina agreed, but later that day she took the children with her to a park in Bayonne to meet Jeffrey.  Nina told police that after Jeffrey refused to cooperate with Bulakowski's attempt to perform a background check on him, she went to the park intending to end their relationship.

After speaking with Jeffrey in the park, Nina returned to her apartment, pushing her two children in a baby carriage. Jeffrey walked with or behind her[4] to her apartment, which was a few blocks away.  When she reached her building, Nina unlocked the front door and pushed the carriage containing the two children into the hallway.[5]  Jeffrey followed Nina inside and, after closing the door, pushed her up against the wall and began to rub her vagina over her clothes.  Nina attempted to escape up the stairs to her apartment, but Jeffrey grabbed her and pulled her back down the stairs.  He then pushed her up against the wall again and tried to kiss her.  Nina tried to push him off and hit him repeatedly in the chest and shoulders to no avail. Jeffrey then ripped off Nina's shorts and underwear and, while

---

[4] In her initial report to the police, Nina stated that Jeffrey "walked [her] and the children home."  Bulakowski testified that during a subsequent interview, Nina told police that "while she was walking home [Jeffrey] was following her."

[5] Nina's residence is located in a two-story building with a vacant storefront on the first floor and two apartments on the second.

A-0349-13T3

pinning her to the wall in a standing position, he penetrated her vagina with his finger. Jeffrey then had vaginal intercourse with Nina and ejaculated inside her. Before Jeffrey left, he asked Nina, "Was it good?" The children remained in the baby carriage throughout the incident.

Nina did not report the rape immediately, as she was in shock and in fear of Jeffrey. But on June 30, 2012, Nina reported the incident to the police. The Division was notified and Bulakowski responded to the prosecutor's office where she observed, but did not participate in, an interview with Nina, in which she recounted the details of the rape.

At the conclusion of the interview, the Division conducted a Dodd removal[6] of both children. Bulakowski testified that the decision to remove the children was prompted by the Division's

> ongoing concerns of the willingness to care for the children, and the uncleanliness. We had that referral the week prior, that the children were dirty at the time. Also the ongoing domestic violence allegations in the home, because that was the second one within the month that we received information . . . that raised a concern to the Division.

---

[6] A "Dodd removal" is an "emergency removal of a child from the home without a court order, pursuant to the Dodd Act," N.J.S.A. 9:6-8.21 to -8.82. N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

The Division sought a finding of abuse or neglect against Nina. A fact-finding hearing began on January 30, 2013 and concluded on August 7, 2013. The Division offered two theories supporting their claim. First, it alleged that Nina's "home environment was unsuitable to two young children . . . [and placed them] at an imminent risk of harm."[7] In explaining the second allegation, the deputy attorney general first felt compelled to disclaim any intention by the Division "to re[-]victimize a victim." Nevertheless, she claimed that Nina abused or neglected her children because "her compromised judgment, placed her children at a substantial risk of physical harm, given the statement that [Nina] made, which was that she was raped in front of her children, while her children were next to her screaming and crying."

The Division admitted without objection three Bayonne Police Department incident reports and four Division reports. The Division then called Zajac, who briefly recounted his response on June 24, 2012 and his observations of the condition

---

[7] The trial court found that the Division did not substantiate this charge, and we question why the Division pursued it in the first instance. The record is clear that Nina took immediate remedial action after being informed of the problem by Cirino. Within one hour, she had addressed most of the concerns raised by him. When Bulakowski visited the following day, she expressed satisfaction at the condition of the apartment and complimented Nina's compliance with the Division.

of her apartment. Bulakowski then testified as to her follow-up visit to Nina's apartment on June 25, 2012; her advice to Nina that the Division would not like Jeffrey to be around the children; her observation of Nina's interview with the police on July 2, 2012; and the removal of the children later that day. Finally, Cirino testified as to the events surrounding his response to Nina's apartment on June 24, 2012. Neither the defendant nor the law guardian presented any witnesses or evidence.

At the conclusion of the hearing, the trial court found that the "environmental issues" in Nina's apartment did not rise to the level of "serious risk of substantial harm" by the requisite preponderance of the evidence standard.

As to the second allegation, the judge discussed the incidents of May 24, 2012 and June 24, 2012. As to the May 24 incident, the judge found that "there was violence in that home where the children were present" and that Nina had "apparently underplayed" the incident. Although the judge noted that the incident "might not have been abuse and neglect," she nevertheless concluded that it was "the first indication we have of a history of domestic violence."

The judge then noted that despite advice from the caseworker that she not expose the children to Jeffrey, she

takes these two little infants in the stroller to a place to meet a man she's afraid of, who may have a gun, after being found by a [c]ourt to have committed abuse and neglect by exposing one of the children to a dangerous person in the past. As a result of her horrible judgment, he follows her home, rapes her in the lobby in front of the children, causing the children to see it, screaming the whole time, see[ing] their mother screaming while she's being raped.

And then she doesn't call the police. So, they're at risk of continued harm. Takes five to seven days to call the police.

The judge then referenced Nina's prior substantiation of abuse or neglect from 2010, for leaving James with his father who seriously injured the child:

Even if [Nina] did not believe that [Jeffrey] would hurt the children, she knew her judgment had been wrong in the past for that same exact issue. She knew [Jeffrey] had refused to cooperate in giving any information to the Division. That same day she's told, "Don't have the children near him." And she calls [Jeffrey] and takes the children right there.

Based on her behavior, her lack of appropriate judgment, and her history of her exercising poor judgment and exposing these children to violence, this [c]ourt finds, by a preponderance of the evidence, that . . . [Nina] did exhibit reckless disregard for the safety of the children, was wantonly negligent in exposing them to serious risk of harm, and as in the case of D.M.H.[8] there was no need for the Division, and there's no need for the [c]ourt to wait until the

---

[8] In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

children are actually harmed to protect them.

On appeal, Nina argues that there was not substantial credible evidence in the record to support the trial court's conclusion that she abused or neglected her children. She challenges the Division's proof that she should have known that Jeffrey presented a risk of harm and also notes that there was no proof that the children suffered harm from witnessing the incident.

## II.

N.J.S.A. 9:6-8.21(c) defines an abused or neglected child as a person less than eighteen years of age

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship [or] by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

"If there is no evidence of actual harm, . . . the statute requires a showing of 'imminent danger' or a 'substantial risk' of harm before a parent or guardian can be found to have abused or neglected a child." N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 8 (2013).

A-0349-13T3

We note at the outset that the Division offered no proof and makes no claim now that the children suffered any emotional harm as a result of witnessing their mother's rape by Jeffrey. Indeed, such harm "cannot be presumed in the absence of evidence of its existence or potential." N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 28 (App. Div. 2004) certif. denied, 182 N.J. 426 (2005). Rather, the Division's theory is that Nina knew or should have known that Jeffrey posed a risk of harm to her children, and by bringing them with her to the park to meet him, she placed them at a substantial risk of harm.

In concluding that Nina should have known not to bring the children to the park, the court found it significant that Bulakowski advised her to keep Jeffrey away from them. It bears noting that the caseworker's warning was based entirely on Jeffrey's refusal to provide his address so that she could conduct a background check. The Division had no information to suggest that Jeffrey posed a danger to Nina or the children, and we reject the conclusion that a person who declines to provide the Division with personal information should be assumed to be dangerous.

In G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999), the Court held that a gross or wanton negligence standard should be employed in determining whether the parent or guardian had

failed to exercise a "minimum degree of care" and therefore had committed an act of child abuse or neglect. The Court noted that conduct is willful or wanton if it is "done with the knowledge that injury is likely to, or probably will, result." Ibid.

In her brief relationship with Jeffrey, there was no history of violence, no indication that he had a criminal record, and simply no way for Nina to foresee that a daytime meeting in a public park would result in a brutal and horrific rape. Nina told Bulakowski that Jeffrey may have carried a gun in his job as a security guard, although there is nothing in the record to indicate that she ever saw a gun or even knew with certainty that he possessed one. That is insufficient to support the court's finding that Nina should have known that Jeffrey "may have a gun," when she met him in the park.

In finding that Nina exposed her children to a substantial risk of harm, the trial judge placed significance on two domestic disputes, referring to them as "two prior serious referrals."

The first event the trial judge noted occurred after Nina retreated to her room following an argument with her brother. Nina gave two versions of what occurred next. She told the responding police officers that Fred followed her into her room,

and she was injured when he forced the door open as she tried to close it. She was injured when Fred forced the door open. She later told Bulakowski that "her brother accidentally opened the door [and] hit her in the face which caused her face to bleed." Nina did not testify but the court appeared to have accepted the first version and found that Nina "apparently underplayed" the incident to the Division.

We need not give deference to the trial court in crediting one version of this event over the other, since the court did not have the benefit of Nina's testimony. Any credibility findings that the court implicitly made concerning her account were based on the same written record that is now before us on appeal. Where our review of the record "leaves us with the definite conviction that the judge went so wide of the mark that a mistake must have been made," we may "appraise the record as if we were deciding the matter at inception and make our own findings and conclusions." Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App. Div.), aff'd, 78 N.J. 320 (1987). Even assuming that Fred injured Nina when he pushed the door in, it is undisputed that Nina retreated to her room to get away from her brother. Moreover, there is no proof that the children were exposed to the incident, that they suffered harm

as a result, or that Nina was anything other than a victim who acted reasonably in retreating from the confrontation.

The second event[9] noted by the trial judge involved Joseph, the father of the children.  The court found Nina's prior substantiation, for failing to protect James from harm by his father, was evidence of "her history of her exercising poor judgment and exposing these children to violence."  The court concluded that the 2010 incident should have somehow placed Nina on notice that she should not bring the children with her to meet Jeffrey because "she knew her judgment had been wrong in the past for that exact issue."

N.J.S.A. 9:6-8.46(a)(1) provides that "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of . . . the parent or guardian."  We have held that violence by a defendant against another parent and other children can be admissible to prove that a risk of harm to the children was present as long as the harm is not presumed but established by competent evidence. See N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 557 (App. Div. 2010).  Expert testimony in I.H.C. provided support for a finding that the children were harmed by

---

[9] The trial judge acknowledged that she may have reversed these events chronologically.

the defendant's prior acts of domestic violence, and that these acts showed the defendant's disposition to commit such violence. Id. at 576. However, both the statute and I.H.C. address prior violence by the same perpetrator, which is not the case here. Accordingly, we find the holding in I.H.C. inapplicable to the facts in this case and reject the trial court's conclusion that Nina's actions in 2010 should have placed her on notice that taking the children with her to meet Jeffrey would place them in danger.

The Division's proof was insufficient to establish that Nina failed to exercise a minimum degree of care or that she was in any way aware of the dangers that would follow from taking her children to the park to meet Jeffrey. As Nina's conduct may have been, in hindsight, unwise, it was neither wanton nor grossly negligent, and cannot support a finding that she abused or neglected her children.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0349-13T3