# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3165-21

DEPARTMENT OF
CHILDREN AND FAMILIES,
INSTITUTIONAL ABUSE
INVESTIGATION UNIT,

      Petitioner-Respondent,

v.

K.T.,

      Respondent-Appellant.

_____

Argued November 15, 2023 – Decided January 17, 2024

Before Judges Currier and Firko.

On appeal from the New Jersey Department of Children and Families, Institutional Abuse Investigation Unit, Docket No. AUH 19-0700.

Mark Alan Gulbranson, Jr. argued the cause for appellant (Attorneys Hartman Chartered, attorneys; Katherine Dodge Hartman and Mark Alan Gulbranson, Jr., on the brief).

Wesley G. Hanna, II, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Wesley G. Hanna, II, on the brief).

PER CURIAM

K.T.[1] appeals from the April 1, 2022 final agency decision of the Department of Children and Families (DCF) substantiating findings of sexual abuse/risk of sexual abuse against her.  We affirm.

I.

At the time of the events in question, B.H. was a seventeen-year-old male resident at Bancroft—"a residential housing facility for disabled individuals." Bancroft "provides educational and residential services for individuals with developmental disabilities."  B.H. was diagnosed as "autistic, limited verbally, and intellectually disabled."  His reading ability was on a second-grade level, and he was able to "answer[] comprehension questions with assistance on a first[-]grade level."  K.T. worked at Bancroft as a Program Associate—she was assigned to B.H. as his one-to-one aide.

In February 2019, B.H.'s guardian, his grandmother, raised a concern unrelated to these events.  To investigate that concern, Steven Stanewich, a

---

[1] We use initials to protect the privacy and confidentiality of these proceedings. R. 1:38-3(d)(11).

Senior Program Manager at Bancroft, reviewed footage of B.H.'s living quarters.[2] While watching the footage, he saw two events a few days apart in which K.T. was seen "inappropriately touching [B.H.]." After watching the February 16, 2019 video (the first video), Stanewich reported he saw "[K.T.] placing her face in [B.H.'s] face, touching her face to his face, caressing [B.H.'s] face[,] caressing his hair . . . tickling him[,] and closed[-]mouth kissing him on different areas of his face/forehead" before "caress[ing] [B.H.]'s face and chin and open[-]mouth kiss[ing] [B.H.] with [B.H.] also leaning in to kiss [K.T.] She d[id] not appear to stop or block him as soon as [B.H.] caressed her face, chin and when contact was made on her lips." According to Stanewich, the first video also showed K.T. kissing B.H. "with an open mouth for several seconds." The door to B.H.'s bedroom was closed during the interaction.

Stanewich also reported seeing inappropriate behavior in a February 23, 2019 video (the second video). He stated the second video displayed "[K.T.] and [B.H.] . . . hugging on [B.H.'s] bed which in turn led to similar behavior on the floor." He reported the incidents to the police and other authorities.

---

[2] A Bancroft administrator testified that video recordings of residents' bedrooms were made in the ordinary course of business but were not routinely monitored or reviewed.

In the ensuing investigation conducted by Bancroft, the videos were reviewed and descriptions of the actions seen on them were corroborated. Bancroft's representative described her view of the videos during the Office of Administrative Law (OAL) hearing. B.H. was unable to give any account of the incidents due to his limited verbal capabilities. The report noted the door to the room was closed in the first video and slightly open in the second one.

K.T. was shown the video footage. She agreed her actions were inappropriate but stated further that she was from Slovakia, where the cultural norm was to display affection and kiss others on the mouth. K.T. also conceded she "crossed the boundaries" in the second video by "not keep[ing] [the relationship] professional," and stated "it never should have happened." K.T. told the investigator she had formed a connection with B.H.'s family and considered B.H. as part of her family, but it "was a big mistake" to treat B.H. like her own child. "[S]he was 'not positive if [she had] kiss[ed] [B.H.] . . . outside of the bedroom.'"

Bancroft also spoke with B.H.'s grandmother who said she was "fond" of K.T., who "was instrumental in getting [B.H.] a communication device and with using appropriate utensils during meals." The grandmother also explained K.T. was kind and taught B.H. to play baseball for the first time, describing her as "a

'godsend to us.'" The grandmother agreed that K.T. was close with B.H.'s family.

Bancroft's high school program director, Kiesha Gill Jacob, reported to the investigator she was previously notified of an incident where B.H. grabbed K.T. by the waist and thrust himself up against her. Jacob stated she reminded K.T. about the importance of "maintaining proximity and boundaries with the students." The February 7, 2019 memorandum memorializing the incident described "B.H. grabb[ing] [K.T.'s] waist and the two of [them] 'thrust[ing]' in a dance[-]like manner" but "there was no concern of ill intent." Another teacher reported to the investigator she had spoken with K.T. about proximity issues with B.H. "approximately [three-to-four] times in a [four][-]month period prior to the [first incident]."

Additional staff reported seeing B.H. and K.T. tickling and playing around but no kissing or cuddling. B.H.'s grandmother also allowed K.T. to take B.H. out of Bancroft overnight on therapeutic leaves of absences. Bancroft's principal and program director had met with K.T. in February 2019 to discuss the school's policy that staff should not be hired by family members or guardians of individuals in Bancroft's care, but they could socially interact with the family

on an unpaid basis, such as going to family dinners, birthday parties, and similar events.

Bancroft's internal investigation concluded "[t]here is a preponderance of credible evidence to support the allegation of . . . [s]exual [a]buse—sexual contact or other. Therefore[,] the allegation is substantiated." The matter was reported to the human resource department for corrective action.

On February 25, DCF's Institutional Abuse Investigative Unit (IAIU) began its investigation, led by Dana McBride-Garrett, working along with the Burlington County Prosecutor's Office. McBride-Garrett's summary of her view of the videos was substantially the same as that of Bancroft's. She also interviewed B.H.'s grandmother and Bancroft personnel.

In the prosecutor's detective's conversation with K.T., she admitted kissing B.H but said it "was normal for her to kiss people." K.T. said "[B.H.] gets excited" with the kiss sometimes. The prosecutor concluded there was insufficient evidence to support criminal charges and closed its investigation.

McBride-Garrett also contacted K.T., who confirmed the incidents seen on the videos occurred, but it was not her intention for the kiss to be inappropriate. She described herself as a very affectionate person, which was common in her culture, and her acts were not sexual in nature. K.T. said she

used close face-to-face contact with B.H. to get his attention. K.T. reiterated she treated B.H. as if he were her own child and kissing on the mouth was accepted in her culture. She acknowledged she did not have that type of relationship with any of the other children to whom she was assigned at Bancroft.

In reviewing the second video, K.T. said the pulling actions were inappropriate and she tried to get up. She said it was "a normal spontaneous reaction" from B.H. when she tickled him, and it had happened before. K.T. denied kissing B.H. on the mouth any other time.

B.H.'s grandmother told McBride-Garrett she became close friends with K.T. She stated she had permitted K.T. to take B.H. to K.T.'s home and K.T.'s children were present. The grandmother described B.H. as affectionate and he liked to hug her.

IAIU concluded its investigation report, stating:

> The results of the investigation indicated that intimate physical contact occurred between . . . [B.H.], age [seventeen] and Residential Assistant [K.T.] Video surveillance confirmed that [K.T.] caressed, and open[-]mouth kissed [B.H.] while in his bedroom at the facility. [B.H.], an [a]utistic child, reacted to [K.T.]'s engagement by caressing her face, hugging her and then pulling her down to the floor where she straddled him. It should be noted that residential staff did observe

other incidents of close, physical contact between [B.H.] and [K.T.]

The investigation also concluded that B.H. "[was] an abused child" and "was placed at substantial risk of harm by virtue of the incident." The risk of sexual abuse was substantiated under N.J.S.A. 9:6-8.21. Bancroft terminated K.T. in March 2019.

## II.

K.T. appealed the substantiation to the OAL and it was assigned to an Administrative Law Judge (ALJ) for a hearing. During the June 25, 2021 hearing, Bancroft personnel testified consistent with their investigation report.

McBride-Garrett also testified regarding her investigation. She explained that IAIU considers risk of sexual harm to be a form of sexual abuse. She testified about what she saw on the videos and reviewed them again during the hearing. She said she viewed K.T. approach B.H. "when he was on the bed after the initial being pulled down" and it did appear that she was attempting to get closer to him.

McBride-Garrett stated she substantiated K.T. for sexual abuse in the form of "risk of harm." She said "K.T. subject[ing] B.H. to sexual activity" was an absolute substantiating factor present in the case. She described the sexual

activity as "[t]he inappropriate physical contact and the kiss[;] the open[-]mouth kiss is where the concern is noted."

When asked what she meant by inappropriate physical contact, McBride-Garrett replied,

> The boundaries, the closeness . . . that K.T. had with B.H. and the appearance . . . that a kiss could occur on the video . . . . The closeness of and the comfortability of B.H. placing his head on . . . K.T.'s stomach. K.T. caressing B.H.'s hair. B.H. being comfortable enough to pull K.T. down on the floor and also pull K.T. into an embrace while on the roommate's bed is very concerning.

McBride-Garrett explained she was concerned by the second video when the two were on the floor because K.T. did not separate herself and the two remained close, "[n]othing in the behavior changed." Regarding the open-mouth kiss "it appeared that . . . K.T.'s tongue was moving in her mouth and when . . . B.H. pulled K.T. to the floor, it was a comfortable embrace." Moreover, McBride-Garrett said there appeared to be straddling, which is inappropriate sexual contact as well. She also noted, in addition to the kissing, closeness, and straddling, the caressing of the head "impose[d] a substantial risk of harm of sexual abuse to the child."

During B.H.'s grandmother's testimony, she reiterated that B.H. was affectionate and liked to hug. She did not see anything sexual in the interactions

between B.H. and K.T. The grandmother confirmed she authorized K.T. to take B.H. outside of Bancroft. She did not recall why K.T. took B.H. overnight.

K.T. testified she was born in Slovakia and worked with special needs children while earning her degree. After moving to the United States, she worked at a daycare. She started at Bancroft in January 2018, and was assigned as an aide to B.H. the following summer.

K.T. said B.H. made great progress with his education skills during the time she worked with him. She also worked with him outside of school, saying he loved to be outside, including trips to the Franklin Institute and enrolling him in a baseball program. She considered him as part of her family.

K.T. acknowledged becoming attached to B.H., but never in a sexual way. She denied being attracted to him in a sexual way. She conceded she physically touched him in the form of "play[ing] with my hands in his hair, play[ing] with his hair, put[ting] my hands on his face. I would hug him. He likes squeezes. I would squeeze him. I would kiss him, yes, I did." She said she would kiss him on the mouth and other places. She would also tickle him, saying "That was his favorite." They played a game where he would say "hands up, hands up" and she would run up to him and tickle him. She reiterated it was never sexual.

10

When asked if she was straddling B.H. in the second video, she replied "No," stating he "liked to pull people down" and she "was trying to get up . . . as soon as possible." She acknowledged she was tickling him on the roommate's bed. She said she was pulled onto the bed. While on the bed she believed she counted down from three, as it was common for her to do that, and he let go. Regarding the kiss on the first video, K.T. agreed that B.H. pulled her toward him and kissed her. She said her mouth was not open and it was not a sexual kiss. K.T. conceded the kiss was a mistake but said the close face-to-face contact and caressing of B. T.'s face seen in the videos was not inappropriate. She did not believe that tickling B.H., holding his head to her chest, and straddling him was improper behavior.

The ALJ issued his initial findings on November 17, 2021. He found the videos "show[ed] activity that, while inappropriate in nature for K.T. as an instructor and aid[e] to B.H., do not document any open[-]mouth kissing, or other activities which can be construed as overt in nature." The ALJ noted K.T. acknowledged the "activities were inappropriate." However, the ALJ found "these activities . . . were not of a sexual nature." The ALJ found DCF's witnesses were credible and detailed, but they were "perhaps reaching for something that was not seen on the video."

After reviewing the videos, the ALJ found they demonstrated a "familiarity" that was "more suited to the relationship between a parent and a child—not a provider and a patient—but no sexual overtures, inference[,] or activity [was] . . . seen." Therefore, the ALJ concluded "that such conduct, although constituting an inappropriate level of familiarity, does not constitute a 'Risk of Sexual Abuse' within the meaning of N.J.S.A. 9:6-8.21(c) . . . ." Thus, "the allegations of abuse and neglect . . . [were] not . . . substantiated."

## III.

On April 1, 2022, DCF Assistant Commissioner Brian C. Ross issued a final decision. The Assistant Commissioner reviewed the ALJ's findings and conclusions, listened to the audio recording of the hearing and watched the videotapes.

The Assistant Commissioner thoughtfully noted that "the evidence in this case is not dependent on the observations and opinions of the witnesses or the information gathered during the course of their investigations. Uniquely, the evidence in this case is as equally viewable by this agency as it was by the ALJ." The Assistant Commissioner found his "own review of the videotapes . . . compels the conclusion that [K.T.]'s actions placed B.H. at risk of sexual abuse." The Assistant Commissioner found K.T. initiated the kiss seen on the first video

12

that "lasted for at least five seconds," and that "[a] five second kiss on the lips in the context of an adult and child interaction [was] extremely offensive." The Assistant Commissioner stated the

> ALJ . . . failed to recognize that such action, while comfortable in the context of two consenting adults, created a circumstance for a child which not only crossed the boundary of appropriate, but lent itself to a highly sexualized and inappropriate interaction. In this context, specifically K.T. alone with B.H. in his bedroom, one need only count five seconds to realize that such a time frame is shocking.

The Assistant Commissioner also discussed the second video, stating,

> K.T.'s conduct . . . [of] insert[ing] her leg between B.H.'s and then straddl[ing] the child with her groin positioned above his, is no less inappropriate. When they separate momentarily, K.T. re[-]engages with the child and pushes him over to a bed where she is again positioned on top of the child with her face close to his.

In addressing K.T.'s "characteriz[ation] [of] her actions as fondness and affection," the Assistant Commissioner found the statements unsupported by the record since Bancroft management had discussed proximity and boundary issues with K.T. just three weeks before her "even more inappropriate" behavior with B.H.

The Assistant Commissioner found "K.T.'s conduct [was] even more egregious when considered from the perspective of the child-victim" particularly

13

B.H. who is autistic with limited verbal skills and intellectually disabled. The

Assistant Commissioner stated,

> [T]here is no way to determine whether [B.H.]
> interprets [K.T.'s] conduct as merely affection or as
> sexual advances or whether he finds her actions
> welcome or repugnant. Were K.T. to engage in similar
> behavior with a fully[]abled high school senior, her
> conduct would unquestionably constitute sexual abuse.
> Certainly, vulnerable adolescents such as B.H. deserve
> no less protection.

Therefore, the DCF reversed the ALJ's decision and affirmed the finding of

substantiated abuse.

## IV.

On appeal, K.T. contends the DCF's final decision is not factually

supported, rendering it arbitrary and capricious. We are unconvinced.

The scope of judicial review of an administrative decision is limited. In

re Herrmann, 192 N.J. 19, 27 (2007). "An administrative agency's final quasi-

judicial decision will be sustained unless there is a clear showing that it [was]

arbitrary, capricious, or unreasonable, or that it lack[ed] fair support in the

record." Id. at 27-28.

An appellate court is limited to determining:

> (1) whether the agency's action violate[d] express or
> implied legislative policies, that is, did the agency
> follow the law; (2) whether the record contain[ed]

14

substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[In re Carter, 191 N.J. 474, 482-83 (2007) (quoting Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995)).]

"[I]f substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988)). "[A] reviewing court . . . will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein." De Vitis v. N.J. Racing Comm'n, 202 N.J. Super. 484, 489-90 (App. Div. 1985).

"In proceedings before an administrative agency . . . it is only necessary to establish the truth of the charges by a preponderance of the believable evidence and not to prove guilt beyond a reasonable doubt." Atkinson v. Parsekian, 37 N.J. 143, 149 (1962) (citing Freud v. Davis, 64 N.J. Super. 242 (App. Div. 1960)); N.J.S.A. 9:6-8.46(b). "[I]n challenging an agency's determination, an appellant carries a substantial burden of persuasion, and the

agency's determination carries a presumption of reasonableness." Dep't of Child. & Fams. v. C.H., 414 N.J. Super. 472, 479-80 (App. Div. 2010), adhered to on reconsideration, 416 N.J. Super. 414 (App. Div. 2010).

K.T. asserts there was insufficient evidence for DCF to substantiate her for abuse and neglect under N.J.S.A. 9:6-8.21(c). Considering the totality of the circumstances, K.T. argues there is no evidence demonstrating "overt sexual contact," which would otherwise need "little or no context to demonstrate sexual abuse." Instead, K.T. asserts the evidence established she had a "quasi-parental bond with B.H." and she was only showing affection "by touching or playing with him the way a mother might with her child." K.T. contends the Assistant Commissioner improperly disregarded the context of the relationship shared by K.T. and B.H., and "a five second kiss on the lips[,] and . . . an incident in which K.T. straddle[d] B.H." are not "inherently sexual" or "inconsistent with how a mother might show affection to her son." K.T. contends DCF erroneously relied on the videos which only depicted ambiguous conduct and did not show "overtly sexualized behavior."

Under N.J.S.A. 9:6-8.21(c)(3), an "[a]bused or neglected child" is defined as "a child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child."

16

The definition of "[p]arent or guardian includes a teacher, employee, or volunteer, whether compensated or uncompensated, of an institution who is responsible for the child's welfare and any other staff person of an institution regardless of whether or not the person is responsible for the care or supervision of the child." N.J.S.A. 9:6-8.21(a).

"Sexual abuse" is defined as "contacts or actions between a child and a parent or caretaker for the purpose of sexual stimulation of either that person or another person." N.J.S.A. 9:6-8.84; N.J.A.C. 3A:11-1.3. It includes "the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct;" as well as "sexual penetration and sexual contact as defined in N.J.S.[A.] 2C:14-1 and a prohibited sexual act as defined in N.J.S.[A.] 2C:24-4." N.J.S.A. 9:6-8.84; N.J.A.C. 3A:11-1.3.

"[A]cts of abuse or neglect [are] considered on a case-by-case basis and must be 'analyzed in light of the dangers and risks associated with the situation.'" N.J. Div. of Youth and Fam. Servs. v. S.I., 437 N.J. Super. 142, 153 (App. Div. 2014) (quoting N.J. Dep't of Child. and Fams. v. R.R., 436 N.J. Super. 53, 58 (App. Div. 2014)). "[An] adjudication of abuse or neglect is governed by Title [Nine], which is designed to protect children who suffer serious injury inflicted

by other than accidental means." S.I., 437 N.J. Super. at 152 (citing G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 171 (1999)). There must be "more than ordinary negligence" found against the parent or guardian. Id. at 153 (quoting G.S., 157 N.J. at 178). Instead, "a gross or wanton negligence standard should be employed in determining whether the parent or guardian had failed to exercise 'a minimum degree of care' and therefore had committed an act of child abuse or neglect." N.J. Div. of Youth and Fam. Servs. v. N.M., 438 N.J. Super. 419, 428 (App. Div. 2014) (quoting G.S., 157 N.J. at 178). Willful or wanton actions are those that are done knowing that injury is likely or probably likely to occur. Ibid.

In the absence "of actual harm, . . . the statute requires a showing of 'imminent danger' or a 'substantial risk' of harm before a parent or guardian can be found to have abused or neglected a child." S.I., 437 N.J. Super. at 154 (quoting N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 8 (2013)). DCF is not required to "wait until a child is actually harmed . . . before . . . address[ing] . . . conduct adverse to a minor's welfare." Ibid. (citing N.J. Div. of Youth & Fam. Servs. v. V.M., 408 N.J. Super. 222, 235-36 (App. Div. 2009) (Carchman, P.J.A.D., concurring)).

We are satisfied the Assistant Commissioner's reversal of the ALJ's initial decision was not arbitrary, capricious, or unreasonable, and it did not lack substantial support in the record. DCF did not disregard the ALJ's credibility findings. The Assistant Commissioner acknowledged the ALJ's finding that the DCF's witnesses, who both concluded that sexual abuse did occur, were credible. He also found the record did not support "K.T.['s] characteriz[ation] [of] her actions as fondness and affection[] as she would engage in with her own children." N.J.S.A. 52:14B-10(c). However, the Assistant Commissioner found the dispute did not turn on the credibility of the witnesses because the video evidence was equally viewable by DCF, and the determination of abuse and neglect could be made on the review of videos and the record. ZRB, LLC v. N.J. Dep't of Env't Prot., 403 N.J. Super. 531, 561-62 (App. Div. 2008).

The Assistant Commissioner relied on evidence in the record to contradict the conclusion that K.T. was merely acting with affection in her interactions with B.H. He referred to the note memorializing the discussion with K.T. after the first incident where she was counseled about "proximity when working with students" after an "episode of suggestive dancing." The note alerted K.T. that her conduct was inappropriate, and she needed to maintain an appropriate distance from B.H.

In the final agency decision, the Assistant Commissioner clearly stated his reasons for rejecting the ALJ's findings that the DCF witnesses "were 'perhaps reaching for something that was not seen on the video.'" He first quoted Bancroft's investigator's testimony at the hearing describing her observations of the videos, which included K.T. "run[ning] her hands through B.H.'s hair," moving her hand along his jaw before moving her face close to his, giving him a "peck" on the face—which B.H. reciprocated, and B.H. pulling K.T. to the floor where she straddles him before the two end up on the roommate's bed. The Assistant Commissioner then reviewed the first video himself, noting the kiss "lasted for at least five seconds" and occurred between an adult and a child alone in the child's bedroom. He then reviewed the second video, noting that K.T. straddled B.H. in a way where "her groin [was] positioned above his." The Commissioner found this to be "no less inappropriate" than the five-second kiss. These observations are supported by a review of the videos, were consistent with Bancroft's and IAIU's investigative reports, and DCF witnesses' testimony. DCF's modified factual findings were supported in the record as required under N.J.S.A. 52:14B-10(c).

The fact that opinions might differ on the severity of the conduct does not result in a finding that DCF's conclusion, supported by the record evidence, was

arbitrary, capricious, or unreasonable. DCF is not required to wait and see if worse and more definitive evidence of sexual abuse emerges before intervening on B.H.'s behalf. S.I., 437 N.J. Super. at 154. There is support in the record that B.H. was, at a minimum, exposed to a substantial risk of harm during the kiss and the straddling that took place while he was alone with K.T. in his bedroom. Ibid.

K.T.'s assertion that she established a parent-like relationship with B.H. does not change the DCF's conclusion. Such a relationship is not a mitigating factor in the totality of the circumstance analysis. Indeed, the statute expressly includes parents as a class of potential perpetrators. N.J.S.A. 9:6-8.21(c).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-3165-21