**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3944-14T4

NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY,

Plaintiff-Respondent,

v.

T.C.,

Defendant-Appellant.

---

IN THE MATTER OF A.T.M.,

Minor.

---

Submitted May 2, 2017 – Decided June 1, 2017

Before Judges Yannotti, Fasciale and Sapp-Peterson.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0389-14.

Joseph E. Krakora, Public Defender, attorney for appellant (Lora B. Glick, Designated Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz,

Assistant Attorney General, of counsel; Merav Lichtenstein, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Olivia Belfatto Crisp, Assistant Deputy Public Defender, on the brief).

PER CURIAM

T.C. appeals from an order of the Family Part dated April 29, 2014, which found that she abused or neglected her minor child, A.T.M. We affirm.

T.C. is the biological mother of A.T.M., who was born on August 2, 2013. On January 6, 2014, the Division of Child Protection and Permanency (Division) conducted an emergency removal of the child because T.C. had been admitted to a hospital, and N.M., who was thought to be the child's biological father, could not be located. A.T.M. was found in the care of J.K., who was using an open oven and an electric fan to heat the apartment.

On January 8, 2014, the Division filed a complaint in the Family Part against T.C. and N.M., seeking care, custody, and supervision of A.T.M., and applied to the court for temporary relief. T.C. and N.M. appeared at the initial hearing and T.C. identified N.M. as the child's father; however, J.K. had informed the Division that he believed he was the child's father. The court granted the Division's application. The court determined that the

child could not remain in a home that lacked heat. The court found that T.C. did not have appropriate housing, and T.C. had mental health issues. The court ordered T.C. to show cause why the child should not remain in the Division's care, custody, and supervision. Thereafter, the Division amended its complaint and added J.K. as a defendant.

On February 24, 2014, the return date of the order to show cause, the Division presented the court with T.C.'s psychiatric evaluation, which recommended medication and individual therapy. The Division had referred T.C. for mental health services, but she did not attend the services consistently and had been discharged from the program. The Division also had scheduled T.C. for parenting skills classes and anger management therapy. The court ordered that A.T.M. would remain in the Division's care, custody, and supervision. The court also ordered T.C. to attend mental health services.

On April 29, 2014, the court entered an order dismissing the complaint as to N.M., because paternity tests ruled him out as the child's biological father. On that date, the court also conducted a fact-finding hearing in the matter. T.C. did not attend.

At the hearing, the Division's caseworker testified that she spoke with T.C. at the hospital after A.T.M. was born. T.C. said she, N.M., and A.T.M. were going to reside with N.M.'s brother in

his one-bedroom apartment in Irvington. T.C. denied that she used controlled substances or had any mental health issues or learning disabilities. She claimed she had recovered from a period of depression following her mother's death.

The Division conducted a background check and determined that T.C. was receiving $741 per month in social security benefits, of which $250 went towards rent. On August 5, 2013, a Division worker visited the apartment and determined that T.C. and N.M. could appropriately care for the child. T.C. agreed to participate in a psychological evaluation and expressed an interest in receiving counseling.

T.C., N.M., and A.T.M. remained in the Irvington apartment for about one month, when N.M.'s brother locked them out. T.C. claimed that she gave rent money to N.M., but he never gave the money to his brother. T.C., N.M., and A.T.M. moved in with one of N.M.'s other relatives in an apartment in East Orange. In October 2013, a Division worker informed T.C. she could not remain with the child in that apartment during the winter, because it did not have functioning heat. The worker also told T.C. she could not use an electric heating fan to heat the apartment.

T.C., N.M., and A.T.M. then moved into an apartment with T.C.'s brother in Newark, but T.C.'s brother told them to leave because T.C. refused to contribute $200 toward the rent. In early

December 2013, T.C., N.M., and A.T.M. moved in with N.M.'s mother; however, they could not remain there. N.M.'s mother was living in senior citizen housing, and she was only permitted to have N.M. and T.C.'s other two children stay there with her.

T.C., N.M., and A.T.M. relocated to another relative's home in Newark. The relative told them to leave because they would not contribute to the rent. Thereafter, N.M. went to live with a brother in Pennsylvania, and T.C. and A.T.M. moved in with J.K., her new boyfriend. It appears that T.C. had been dating J.K. about three months.

In December 2013, the Division's worker met with T.C. and told her that she should contact the welfare department for housing assistance. T.C. signed a family plan, in which she agreed to take A.T.M. to a pediatrician, attend scheduled appointments at the Family Services Bureau (FSB), and explore all housing options. The worker told T.C. that A.T.M. would be removed from her care if she became homeless. T.C. did not attend the scheduled appointments at the FSB.

On January 5, 2014, T.C. was transported by ambulance to a hospital, after she complained of chest pains. Persons at the hospital contacted the Division, and the Division's workers met with T.C. to inquire about A.T.M. Initially, T.C. said she left the child with a family friend, specifically, J.K. She claimed the

child was at a location on Avon Avenue in Newark. T.C. later said she, J.K., and A.T.M. had been living at that location.

The workers were unable to find a residence at the address T.C. had provided. They contacted the hospital and learned of another address on Jeliff Avenue in Newark. The workers went to the house at that address; however, it appeared to be abandoned. The workers called T.C.'s relatives and other persons, but no one knew where A.T.M. could be located.

On January 6, 2014, the Division's workers went to the Jeliff Avenue address. At first, the workers were unable to gain access, but thereafter spoke to T.C.'s friend, who said that T.C. had been living at that address with her new boyfriend. The workers returned with officers from the Department of Human Services. They were admitted to the residence, and J.K. met them at the door to the apartment.

One of the workers found A.T.M. sitting unstrapped in a car seat on the sofa. The child was dressed in dirty clothes and appeared disheveled. The worker noticed that J.K. was using an open oven and an electric fan to heat the apartment. She explained to J.K. that it was dangerous to heat the apartment in that manner due to the risk of carbon monoxide poisoning. The worker also told J.K. the Division would have to remove the child because she could not remain in an apartment without functioning heat.

J.K. told the worker that he, T.C., and the child slept together in a twin bed, and one of the workers said the child required a bassinette or crib. J.K. stated he did not know what happened to A.T.M.'s bassinette. A worker asked J.K. about the child's food, and J.K. showed her a half-full can of baby formula. The workers determined that the child had to be removed on an emergency basis.

T.C. and the Law Guardian did not offer evidence or present any witnesses at the hearing. The court placed an oral decision on the record, finding that T.C. had abused or neglected A.T.M. The court noted that T.C. had resided in several different homes, and she and the child eventually moved into an apartment that was being heated by an open oven and an electric fan, even though the Division's worker previously told her she could not have the child in a home without functioning heat during the winter.

The court noted that while T.C. was in the hospital, she had initially been evasive about the child's location, because she knew the Division would not find the residence to be acceptable for a child. The court also stated that T.C.'s decision to leave A.T.M. with J.K. was troubling, because he was a person she had only recently met. The court found that A.T.M. could have been left with other relatives or friends, but T.C. decided to leave the child with J.K. in an unsuitable residence.

The court concluded that considering the totality of circumstances, T.C. had abused or neglected A.T.M. by placing the child at substantial risk of harm. The court cited the use of an open oven as a source of heat; sleeping with the child and J.K. on a twin bed; dressing the child in unclean clothes; leaving the child with J.K.; failing to secure suitable housing; moving in with various relatives and friends until she was told to leave because she did not contribute toward the rent; and failing to maintain her welfare and social security benefits.

The court entered an order dated April 29, 2014, which stated that T.C. abused or neglected A.T.M. On January 5, 2015, the court approved the Division's permanency plan, which called for the termination of T.C.'s parental rights and the child's adoption. The court entered an order on January 14, 2015, which dismissed the complaint as to J.K. because paternity tests showed he was not the child's biological father. On March 16, 2015, the court dismissed this action, after the Division filed its guardianship complaint. This appeal followed.

On appeal, T.C. argues that the trial court erred because it based its findings of abuse or neglect entirely upon her poverty. She contends that a parent or caretaker's poverty cannot support a finding of abuse or neglect, and the court erred by relying upon what she says were mischaracterizations of the record by the

Division's attorney. She also argues that the court erred by failing to convert the matter to a Title 30 action because this case did not involve abuse or neglect.

The scope of our review in an appeal from an order entered by the Family Part in an abuse or neglect matter is limited. N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 112 (2011). We must uphold "factual findings undergirding the trial court's decision if they are supported by 'adequate, substantial and credible evidence' on the record." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

An "abused or neglected child," is defined by N.J.S.A. 9:6-8.21(c)(4), as a child who is less than eighteen years of age and

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof[;] . . . or by any other acts of a similarly serious nature requiring the aid of the court[.]

"'Whether a parent or guardian has failed to exercise a minimum degree of care' in protecting a child is determined on a case-by-case basis and 'analyzed in light of the dangers and risks associated with the situation.'" N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 614 (App. Div. 2010) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999)). "'[M]inimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., supra, 157 N.J. at 178.

This standard "implies that a person has acted with reckless disregard for the safety of others." N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 153 (App. Div. 2014) (quoting G.S., supra, 157 N.J. at 179). Moreover, a parent may be found to have abused or neglected a child when the parent creates a substantial risk of harm, since a court "need not wait until a child is actually irreparably impaired by parental inattention or neglect." In the Matter of the Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

Here, there is sufficient credible evidence to support the trial court's finding that T.C. abused or neglected A.T.M. by failing to provide the child with the minimum degree of care. As the record shows, A.T.M.'s physical, mental, or emotional condition was in imminent danger of becoming impaired because T.C.

did not provide the child with a safe and stable home. At the time of the child's removal, T.C. was living with the child in an apartment that was being heated with an open oven and an electric fan. T.C. had previously been told the child could not be kept in an apartment without functioning heat in the winter months. Moreover, A.T.M. did not have adequate sleeping arrangements, lacked clean clothing, and appeared to lack sufficient food.

T.C. argues that the court's finding that she abused or neglected A.T.M. should be reversed because she was not financially capable of providing the child with a safe and stable home. She contends that the court erred by finding that she abused or neglected the child due to poor choices. She contends her temporary housing arrangements were driven solely by poverty. These arguments are without merit.

The record shows that at various times, T.C. had been receiving food stamps, welfare payments, and social security benefits. At times, T.C. was forced to leave homes where she was staying because she failed to contribute to the rent even though she was then receiving social security benefits. The record also shows that the Division instructed T.C. to explore all options for housing assistance, and she signed a family agreement, in which she committed to doing so. T.C. did not take the necessary steps

to obtain such assistance. Eventually, T.C. elected to move in with J.K., in a residence that was clearly unsafe.

In support of her appeal, T.C. relies upon New Jersey Division of Child Protection and Permanency v. L.W., 435 N.J. Super. 189 (App. Div. 2014). In that case, the trial court found that the parent neglected her two young children by failing to provide them with housing. Id. at 191. The parent moved with her fiancé to Georgia, after a fire destroyed her New Jersey housing. Id. at 193. The family returned to New Jersey after a death in the fiancé's family, but did not have funds to return to Georgia. Ibid.

They lived for a while with a relative, and moved to a shelter, but were forced to leave. Ibid. The parent did not qualify for welfare benefits, and was not eligible for housing assistance. Ibid. Eventually, the parent brought her children to the Division's office, so they would not become homeless. Ibid. The trial court determined that the parent's lack of housing was due to "unbelievably poor planning." Ibid.

We reversed the trial court's finding of neglect. Id. at 197. We noted that "poverty alone is not a basis for a finding of abuse or neglect." Id. at 195 (citation omitted). We observed that the parent's "poor planning" was "in part a side-effect of poverty." Id. at 196. We concluded that the evidence did not support the

trial court's decision because the parent sought housing assistance and employment "to no avail." Ibid. We noted that the parent's fiancé could not provide housing, and the parent ultimately did "the responsible thing" by seeking assistance from the Division. Ibid.

We are convinced that T.C.'s reliance upon L.W. is misplaced. The record does not support T.C.'s contention that the trial court's finding that she abused or neglected A.T.M. was based on poverty alone. Rather, in this case, the court found that, although T.C. had the ability and resources to secure appropriate housing, she elected instead to reside in an apartment that was being heated in the winter months by an open oven and an electric fan. The record supports the trial court's finding that, by doing so, T.C. placed the child at substantial risk of harm.

T.C. also argues that the court's decision lacked details and was confusing. She asserts that the decision does not accurately reflect the Division's testimony and evidence. She contends that, in making its decision, the court relied upon "inflammatory misstatements of the evidence" by the Division's attorney. These arguments are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). As stated previously, the court's decision is supported by sufficient credible evidence in the record.

T.C. further argues that the trial court should have converted this case to an action under Title 30, because there was no evidence that she abused or neglected the child. N.J.S.A. 30:4C-12 permits the Division to seek care, custody, and supervision of a child without a finding of abuse or neglect, if the court determines that such an order would be in the child's best interests.

In this matter, the Division's complaint sought relief under both N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12. After completing its investigation, the Division sought a finding of abuse or neglect. The trial court properly found that, in light of the evidence presented, the Division had established by a preponderance of the evidence that T.C. had abused or neglected the child. Under the circumstances, the court did not err by refusing to convert the matter to an action under Title 30.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION