# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4966-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

F.A., SR.,

     Defendant-Appellant,

and

C.P.,

     Defendant.

_____

IN THE MATTER OF F.A.,

     a Minor.

_____

Argued November 21, 2019 – Decided February 21, 2020

Before Judges Suter and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0208-17.

Ryan Thomas Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan Thomas Clark, on the briefs).

Sara M. Gregory, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Stephanie M. Asous, Deputy Attorney General, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Nancy P. Fratz, of counsel and on the brief).

PER CURIAM

Defendant F.A. (Forest)[1] appeals the May 22, 2018 order terminating litigation in the Title Nine case, and the underlying April 20, 2017 order that he abused or neglected his son, F.A. (Frankie)[2] by exposing the child to danger that posed a substantial risk of harm. We reject Forest's contention there was inadequate proof; the record contained substantial, credible evidence he placed

---

[1] We use initials and pseudonyms to maintain the confidentiality of the parties and their child. R. 1:38-3(d)(12).

[2] The order found that defendant C.P. (Carol) also abused and neglected Frankie. She did not appeal.

A-4966-17T2

Frankie at a substantial risk of harm by failing to exercise appropriate care or supervision regarding his living conditions. We affirm.

## I.

We glean these facts from the fact-finding hearing. Forest and Carol are the parents of Frankie, who was born on January 31, 2015. On September 15, 2016, Officer Seminario of the Union City Police responded to a domestic call about a dispute between Forest and Carol. Carol told the officer she and Forest lived there with Frankie. He testified the living conditions in the apartment were "deplorable." There was "filth and clutter" everywhere. Ibid. He saw mice and there was dog feces on the floor. There was no food in the refrigerator, and none for the baby. The officer observed open containers of alcohol. Frankie was only wearing a diaper. He testified the apartment had a bad odor of urine, and his partner could not stay inside. He observed roaches in the child's room. Forest confirmed to the officer that he lived there. Regarding the condition of the apartment, Carol told the officer "this [is] how it always is."

The officer called the Division of Child Protection and Permanency (the Division). The caseworker reported that when she arrived, there were four garbage bags in the kitchen with two or three "rats" running between the garbage bags. There was half eaten food on the counter, no sheets on the crib, and no

3

milk or food for the child. However, Frankie had on a clean pamper, there was no foul stench on the child, and no marks or bruises. The caseworker did not find safety concerns. Because Forest already had left the apartment, the caseworker advised Carol to clean it up.

On September 28, 2016, Officer Nunez of the Union City Police responded to a call that there was a verbal dispute between Forest and Carol. He testified the apartment was "[d]isgusting"; the place was "in shambles." He tried "to stay away from the walls because [he did not] want anything sticking on [him]." The child was dressed in a diaper that was "full" and had a blanket. The Division found the failure to provide for basic needs was "[n]ot [e]stablished," but kept the case open for services.

The Division caseworker attempted to visit the family, making three unsuccessful visits between October and November 2016. On November 15, 2016, Officer Pena of the Union City Police responded to a reported verbal dispute between Carol and Forest. When he arrived, Forest was just leaving the apartment. What the officer observed in the apartment was "[f]ilth." The officer testified there were "garbage bags overflowing in the kitchen" and the smell "was putrid. It was horrible. It was a bad garbage smell." All of this debris could be reached by the child. "[I]t was easily accessible for [Frankie], just to

pick up garbage . . . . [And] [a]t that age, kids put things in their mouth." The child was only wearing a diaper. Forest was trying to leave because he had an outstanding warrant.

The officer contacted the Division. The caseworker observed "the countertops in the kitchen were filthy, . . . it was dirty. The floor was dirty[,]" and there were "at least two big black [garbage] bags on the floor mat of the kitchen." However, the child was clean and there was a little food in the refrigerator. The caseworker advised Carol to clean up. Forest admitted to the caseworker he was residing in the apartment with Carol at that time.

On November 28, 2016, when the caseworker returned, Carol was not there because she was incarcerated—although she was to be released that night—and the maternal grandmother was taking care of Frankie. The caseworker testified that the grandmother "was able to have food for the baby, diapers," "she cleaned the house," and the paternal grandmother also helped care for the baby. The apartment was clean.

On December 7, 2016, the caseworker arrived for a scheduled visit. Carol's sister would not let her in the apartment even though the caseworker had observed Carol go in and out of the apartment. Officer Alvarado responded to the Division's request for assistance, and they eventually gained access to the

apartment. The officer testified that "[i]mmediately upon walking into the home[,] [he] saw several trash bags filled to the top and a horrid smell of urine and dirt." He described "the floors were littered with dead bugs and flies everywhere." The bed in the main bedroom was just a mattress which "was black from filth." "[T]he floor was covered in trash, dead bugs, wrappers, food[,]" and the baby had access to that room. He testified the baby's crib "was urine soaked." There was no "viable food" in the refrigerator. There was dog urine in the kitchen. The child was dirty also. He testified the child "didn't look like he had been bathed in a couple of days and, . . . he didn't look well fed."

The caseworker's testimony confirmed these conditions. There were garbage bags and a bag of dirty diapers. Urine and feces were on the floor. There was no edible food in the refrigerator. The child was not dressed. He had small marks that may have been bite marks on his back, neck and buttocks.

The Division conducted an emergency "Dodd removal"[3] of Frankie that night. Two days later, the Family Part judge approved the Division's custody, care and supervision of the child.

Forest was not present in the apartment on December 7, 2016, because he was incarcerated from November 28, 2016, to December 16, 2016. The Division

---

[3] Removal is authorized by N.J.S.A. 9:6-8.29.

filed an order to show cause and verified complaint against Carol and Forest, seeking a finding of abuse and neglect under N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12, and custody of the child. The fact-finding hearing was conducted on April 20, 2017.

The Family Part judge found that the Division had proven abuse and neglect of Frankie by Forest and Carol under Title Nine. The court found the Division's witnesses were credible. With respect to Forest, the court found he "frequented the apartment, he was in and out and he stayed there on occasion . . . . He was in and out a lot." He supported Carol and the child by buying diapers and food.

The court found the apartment was in "terrible shape."

> [T]his child was in serious danger. Danger of putting something in his mouth including dead flies, feces, urine[-]soaked materials, eating garbage and there was plenty of it because the pictures are very telling.

The court rejected the notion the conditions were due to poverty. Although "poverty may have been a factor in lack of food and a broken tile," there were cleaning implements there but not used, and one did not "need to be poor or rich to take the garbage out." The court found this was a "serious, serious neglect issue," not a poverty issue. Ibid. The court found the conditions did not arise "over a day or two." Rather, the court concluded both parents "neglected"

the child and that the "child was in serious danger of substantial harm and were it not for the Division removing the child, the child will continue to be in that danger and at tremendous risk." Forest had "custody. He had responsibility for that child and getting some food and diapers wasn't enough." Instead, Forest "was willing to leave his baby in there."

The court found the Division had not proven the child's alleged medical condition—scabies—was caused by the condition of the apartment. The court concluded "the whole scabies issue[] is irrelevant."

The court's April 20, 2017 fact-finding order provided that Forest and Carol:

> maintained the home in deplorable conditions with garbage, debris, feces, urine soaked material and dead bugs within reach of the child and for the [sic] all the reasons stated on the record. The above placed the child in serious danger and posed a substantial risk of harm to the child.
>
> Despite the apartment not being under the lease of either parent or the primary residence of [the father], the above finding stands as both had access and knowledge of the conditions of the home.

In May 2018, the litigation was dismissed after a complaint for termination of parental rights was filed.

Forest appeals the Title Nine order and the order that terminated this litigation, arguing that they were not supported by substantial credible evidence in the record. He contends when he left the child in the care of Carol, the apartment was clean just nine days prior to the child's removal. He argues the trial court erroneously entered evidence in the record consisting of hearsay statements and medical opinions of a medical expert, who was not called as a witness at trial.

## II.

We note our general deference to Family Part judges' fact-finding because of their "special jurisdiction and expertise in family matters . . . ." Cesare v. Cesare, 154 N.J. 394, 413 (1998). We will uphold fact-finding that is supported by sufficient, substantial and credible evidence in the record. See N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). The court's interpretation of the law or its legal conclusions are reviewed de novo. See State in Interest of A.B., 219 N.J. 542, 554-55 (2014).

N.J.S.A. 9:6-8.21 defines an "[a]bused or neglected child" as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [N.J.S.A. 9:6-8.21(c)(4).]

Whether a parent has committed abuse or neglect "must be 'analyzed in light of the dangers and risks associated with the situation.'" N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 153 (App. Div. 2014) (quoting N.J. Dep't of Children & Families v. R.R., 436 N.J. Super. 53, 58 (App. Div. 2014)). "The 'paramount concern' of Title [Nine] is to ensure the 'safety of the children,' so that 'the lives of innocent children are immediately safeguarded from further injury and possible death.'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 368 (2017) (quoting N.J.S.A. 9:6-8.8).

In order to prove abuse or neglect under N.J.S.A. 9:6-8.21(c)(4), the Division must "establish by a preponderance of the evidence that: (1) the child's

physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired; and (2) the impairment or imminent impairment results from the parent's failure to exercise a minimum degree of care." A.B., 231 N.J. at 369. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Ibid. (quoting G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 181 (1999)). In making this evaluation, the court should "account for the surrounding circumstances, given that [a]buse and neglect cases are fact-sensitive." Id. at 369-70 (citations omitted) (quoting Dep't of Children & Families, Div. of Child Prot. & Permanency v. E.D.–O., 223 N.J. 166, 180 (2015)). The question is whether the defendant's conduct "recklessly creates a risk of serious injury to the child." N.J. Dep't of Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 169 (App. Div. 2009) (quoting G.S., 157 N.J. at 181).

Forest argues the Division did not prove that he was aware of the apartment's condition on December 7, 2016, because he was incarcerated at that time. He contends the Division's records documented the apartment was clean on November 28, 2016, which was the day he began incarceration. He argues

that evidence was inconsistent with the court's finding he placed his son at substantial risk of harm.

There was ample credible evidence in this record to support the Family Part judge's finding that Forest was residing at the apartment with frequency, not the least of which is that both Carol and Forest told that to the officers. He was there enough to be fully aware of the condition of the apartment, which exposed the child to danger. And, he was willing to leave the child there. There was no evidence he made any arrangements with his mother, Carol's mother or anyone else to clean the apartment or care for the child before, during or after his incarceration.

We agree with the Family Part judge that although poverty played a part in the couple's lack of food and supplies, the dirty condition of the apartment could be remedied as evidenced by its condition when Carol was in jail. There was no explanation why on multiple occasions, there should be urine and dog feces on the floor or garbage littered about. It was Forest's responsibility as well as Carol's to make the apartment safe for the child. His incarceration did not exonerate him from responsibility; there was evidence the conditions were long standing and he did nothing about it.

A-4966-17T2

The record established that Forest failed to make decisions that would keep Frankie safe, which placed the child in imminent danger of harm. We are satisfied the Family Part judge took the evidence into consideration in reaching the abuse and neglect finding under Title Nine. The cases are clear that "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

Forest argues the Family Part judge made an erroneous evidentiary ruling by allowing in evidence—over his objection—the hearsay statements and medical opinions of a medical expert, who was not called to testify at the fact-finding hearing, and then by relying on them. He claims this "may have unduly affected the trial court's findings and conclusions."

The general rule as to the admission or exclusion of evidence is that "[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion." State v. Feaster, 156 N.J. 1, 82 (1998).

Here, the court expressly held that the Division had not proven a connection between the child's alleged medical condition and the environment in the apartment. Thus, the issue about the admissibility of the medical report is not relevant. Moreover, given the conditions at this apartment, if the report's

admission were erroneous, it was not reversible error as there was more than enough evidence to support the court's findings and conclusions without it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4966-17T2